# Exhibit B

| | |
|---|---|
| **From:** | RMIS |
| **To:** | Kara Newberry |
| **Subject:** | Registration Alert: Tforce Freight, Inc. - DOT 121058 - MC109533 - RMISID 14943 |
| **Date:** | Thursday, September 30, 2021 2:26:46 PM |

**Carrier Main Agreement**                                                                                    9/30/2021

### AGREEMENT INFORMATION (MASTER)                                                         close

| | |
|---|---|
| Agreement Date | Thursday, June 30, 2016 |
| Agreed? | Yes |
| Company Name | Ups Freight |
| Contact Name | Lisa Stinson |
| Contact Title | Dispatcher |
| Contact Email | lisastinson@ups.com |
| Agreement | |

| | | | |
|---|---|---|---|
| **Carrier ID:** | 14943 | | |
| **Carrier Name:** | Ups Freight | **Agreement Date:** | 6/30/2016 7:39:30 AM (Pacific Time) |
| **Address:** | 1000 Semmes Ave | **MC Number:** | MC109533 |
| **City, State & Zip:** | Richmond, VA 232181216 | **US DOT Number:** | 121058 |
| **Contact:** | Lisa Stinson | **Phone:** | 866-738-0031 |

### MOTOR CARRIER (TRUCKLOAD) TRANSPORTATION AGREEMENT

This Agreement is entered into this 30th day of June, 2016, by and between **Blue-Grace Logistics LLC**, a Florida limited liability company and Registered Property Broker (MC#-304386) ("Broker"), and Ups Freight, a corporation of the State of VA and Registered Motor Carrier (MC#-MC109533) ("Carrier"), collectively the "Parties," or individually a "Party." "Registered" means operated under authority issued by the Federal Motor Carrier Safety Administration (or its predecessors) within the U.S. Department of Transportation.

1. **CARRIER REPRESENTS, WARRANTS AND COVENANTS THAT IT:**
   A. Is a Registered Motor Carrier of property authorized to provide transportation of property under contracts with shippers and receivers and/or brokers of general commodities, having provided a copy of such license or authorization to Broker.
   B. Shall transport any property subject to this Agreement only with equipment owned by Carrier or leased to Carrier under a lease having a duration of more than thirty (30) days and only under its own operating authority, all

      subject to the terms of this Agreement.
C. Makes the representations herein for the purpose of inducing Broker to enter into this Agreement.
D. Agrees that a shipper's insertion of Broker's name as the carrier on a bill of lading shall be for the shipper's convenience only and shall not change Broker's status as a property broker or Carrier's status as a motor carrier.
E. Will not re-broker, subcontract, assign or interline the transportation of shipments hereunder to any other persons or entities conducting business under a different operating authority unless Carrier is also a Registered Property Broker and without the prior written consent of Broker, all subject to **Appendix A** attached hereto and incorporated herein by reference. Carrier is and at all times shall remain primarily liable to Broker and Broker's customers for each and every shipment made under this Agreement. If Carrier breaches this provision, Broker shall have the right of paying the monies it owes Carrier directly to the delivering carrier, in lieu of payment to Carrier. Upon Broker's payment to delivering carrier, Carrier shall not be released from any liability to Broker under this Agreement.
F.
  i. Is in, and shall maintain compliance during the term of this Agreement, with all applicable federal, state and local laws relating to the provision of its services including, but not limited to: training of drivers; transportation of Hazardous Materials (including the licensing and training of HazMat qualified drivers as defined in 49 C.F.R. §172.800, §173, and §397 et seq.) to the extent that any shipments hereunder constitute Hazardous Materials; security regulations; owner/operator lease regulations; loading and securement of freight regulations; implementation and maintenance of driver safety regulations including, but not limited to, hiring, controlled substances and alcohol testing, and hours of service regulations; sanitation, temperature, and contamination requirements for transporting food, perishable, and other products, qualification and licensing and training of drivers; implementation and maintenance of equipment safety regulations; maintenance and control of the means and method of transportation including, but not limited to, performance of its drivers; and all applicable insurance laws and regulations including but not limited to workers compensation.
  ii. Is solely responsible for any and all management, governing, discipline, direction and control of its employees, owner/operators, and equipment with respect to operating within all applicable federal and state legal and regulatory requirements to ensure the safe operation of Carrier's vehicles, drivers and facilities. Carrier and Broker agree that safe and legal operation of the Carrier and its drivers shall completely and without question govern and supersede any service requests, demands, preferences, instructions, and information from Broker or Broker's customer with respect to any shipment at any time.
G. Will notify Broker immediately if its federal operating authority is revoked, suspended or rendered inactive for any reason; and/or if it is sold, or if there is a change in control of ownership, and/or any insurance required hereunder is threatened to be or is terminated, cancelled,

suspended, or revoked for any reason.
H. Carrier shall defend, indemnify and hold Broker and its shipper customer harmless from any third-party claims, actions or damages (regardless of the nature of the damages), arising out of its performance under this Agreement, including but not limited to cargo loss and damage, theft, delay, damage to property, and personal injury or death. The obligation to defend shall include all costs of defense as they accrue.
I. Does not have a safety rating issued by the Federal Motor Carrier Safety Administration (FMCSA; U.S. Department of Transportation) other than "Satisfactory," and will notify Broker in writing immediately if its safety rating is changed to any safety rating other than "Satisfactory."
J. Authorizes Broker to invoice Carrier's freight charges to shipper, consignee, or third parties responsible for payment.
K. Has investigated, monitors, and agrees to conduct business hereunder based on the credit-worthiness of Broker and is granting Broker credit terms accordingly.
L. On behalf of the shipper, consignee and Broker interests, to the extent that any shipments subject to this Agreement are transported within the State of California, Carrier represents and warrants that:
   i. All 53-foot trailers, including both dry-van and refrigerated equipment it operates and the Heavy-Duty Tractors that haul them within California under this Agreement, are in compliance with the California Air Resources Board (CARB) Heavy-Duty Vehicle Greenhouse Gas (Tractor-Trailer GHG) Emission Reduction Regulations.
   ii. All refrigerated equipment it operates within California under this Agreement is in full compliance with the California Air Research Board (CARB) Transport Refrigerated Unit (TRU) Airborne Toxic Control Measure (ATCM) in-use regulations.

2. **BROKER RESPONSIBILITIES:**
   A. **SHIPMENTS, BILLING & RATES**: Broker agrees to solicit and obtain freight transportation business for Carrier to the mutual benefit of Carrier and Broker, and shall offer Carrier at least one (1) load/shipment annually. Broker shall inform Carrier of (a) place of origin and destination of all shipments, and (b) if applicable, any special shipping instructions or special equipment requirements, of which Broker has been timely notified. All information about the shipment is for informational purposes only.
   B. Broker agrees to conduct all billing services to shippers, consignees or other party responsible for payment. Carrier shall invoice Broker for its charges within fifteen (15) days of the date of delivery of the shipment as mutually agreed in writing, by fax, or by electronic means contained in Broker's Load Confirmation Sheet(s) incorporated herein by this reference. Invoices presented later than ninety (90) days from the date of delivery of the shipment, or the date by which the shipment should have delivered, will be null and void and will not be accepted or paid by Broker or any other shipping party. Additional rates for truckload or LTL shipments, or modifications or amendments of the above rates, or additional rates, may be established to meet changing market conditions, shipper requirements, Broker requirements, and/or specific shipping schedules as mutually agreed upon, and shall be confirmed in writing (or by fax or electronic means) by both Parties. Any such additional, modified, or amended rates,

changes in rates shall automatically be incorporated herein by this reference.
C. RATES: Any rates that may be verbally agreed upon shall be deemed confirmed in writing where Carrier has billed the agreed rate and Broker has paid it. All written confirmations of rates, including confirmations by billing and payment, shall be incorporated herein by this reference. Rates or charges, including but not limited to stop-offs, detention, loading or unloading charges, fuel surcharges, or other accessorial charges, tariff rates, released rates or values, or tariff rules or circulars, shall only be valid when their terms are specifically agreed to in a signed writing by the Parties.
D. PAYMENT:
    i. Broker agrees to pay Carrier's invoice within thirty (30) days after Broker receives from Carrier proof of delivery, the bill of lading and the invoice for a shipment, provided Carrier is not in default under the terms of this Agreement.
    ii. The Parties agree that Broker is the sole party responsible for payment of Carrier's charges. Failure of Broker to collect payment from its customer shall not exonerate Broker of its obligation to pay Carrier. Carrier agrees that it shall not contact Broker's customer directly regarding any payment issue, and Carrier shall not attempt to collect any charges directly from Broker's customer. In addition, Carrier hereby waives any lien rights it may have to freight shipped hereunder.
    iii. In the event of overcharges, duplicate payments, loss/damage/delay claims, or other charges owing to Broker from Carrier, Broker may offset such pending amounts from its payment to Carrier upon advising Carrier of the intent to do so. Payment and other disputes are subject to the terms of Section 4.D., which provides in part that prevailing parties are entitled to recovery of costs, expenses and reasonable attorney fees.
E. BOND: Broker shall maintain a surety bond /trust fund on file with the Federal Motor Carrier Safety Administration (FMCSA) in the form and amount not less than that required by that agency's regulations.
F. Broker will notify Carrier immediately if its federal operating authority is revoked, suspended or rendered inactive for any reason.
G. Broker's responsibility is limited to arranging for, but not actually performing, transportation of a shipper's freight. Carrier shall bear and retain all responsibility for payment of costs and expenses occurred in connection with the transportation services provided hereunder, including, but not limited to, maintenance and repair costs, fuel and lubricants, taxes, salaries, permit fees, insurance, tolls, ferries, and fines.

3. **CARRIER RESPONSIBILITIES:**
   A. EQUIPMENT: Subject to its representations and warranties in Section 1. above, Carrier agrees to provide the necessary equipment and qualified personnel for completion of the transportation services required for Broker and/or its customers. Carrier will not supply equipment that has been used to transport hazardous wastes, solid or liquid, regardless of whether they meet the definition in 40 C.F.R. §261.1 et. seq. Carrier agrees that all shipments will be transported and delivered with reasonable dispatch, or as otherwise agreed in writing.
   B. BILLS OF LADING: Broker shall issue a bill of lading for each shipment

and the terms therein are to be incorporated herein, except to the extent such terms are contrary to the provisions of this Agreement. Unless otherwise agreed in writing, Carrier shall become fully responsible/liable for the freight when it takes/receives possession thereof, and the trailer(s) is loaded, regardless of whether a bill of lading has been issued, and/or signed, and/or delivered to Carrier, and which responsibility/liability shall continue until delivery of the shipment to the consignee and the consignee signs the bill of lading or delivery receipt. Any terms of the bill of lading (including but not limited to payment and credit terms, released rates or released value) inconsistent with the terms of this Agreement shall be ineffective. Failure to issue a bill of lading, or sign a bill of lading acknowledging receipt of the cargo, by Carrier, shall not affect the liability of Carrier.

C. <u>LOSS & DAMAGE CLAIMS</u>:
   i. Carrier shall comply with 49 C.F.R. §370.1 et seq. and any amendments and/or any other applicable regulations adopted by the Federal Motor Carrier Safety Administration, U.S. Department of Transportation, or any applicable state regulatory agency, for processing all loss and damage claims and salvage.
   ii. Carrier's liability for any cargo damage, loss, or theft from any cause shall be determined under the Carmack Amendment, 49 U.S.C. §14706.
   iii. Notwithstanding the terms of 49 CFR 370.9, Carrier shall pay, decline or make settlement offer in writing on all cargo loss or damage claims within sixty (60) days of receipt of the claim. Failure of Carrier to pay, decline or offer settlement within this sixty (60) day period shall be deemed admission by Carrier of full liability for the amount claimed and a material breach of this Agreement.

D. <u>INSURANCE</u>: Carrier shall furnish Broker with Certificate(s) of Insurance naming Broker as a certificate holder for insurance policies providing thirty (30) days advance written notice of cancellation or termination, and unless otherwise agreed, subject to the following minimum limits: General liability - $1,000,000.00 per occurrence and $2,000,000.00 aggregate; motor vehicle (including hired and non-owned vehicles) - $1,000,000.00 per occurrence and $2,000,000.00 aggregate; cargo damage/loss - $100,000.00; workers' compensation with limits required by law; and any other insurance required by the U.S. Department of Transportation, or any other governmental agency whose rules and regulations may apply to Carrier's performance of services under this Agreement. Except for the higher coverage limits that may be specified above, the insurance policies shall comply with minimum requirements of the Federal Motor Carrier Safety Administration and any other applicable regulatory state agency. It is expressly understood that Broker does not represent that the types or minimum limits of the insurance set forth herein are adequate to protect the Broker's interests, and do not otherwise constitute limits of liability. Nothing in this Agreement shall be construed to avoid Carrier's liability due to any exclusion or deductible in any insurance policy.

E. <u>ASSIGNMENT OF RIGHTS</u>: Carrier automatically assigns to Broker all its rights to collect freight charges from the shipper or any responsible third party on receipt of payment from Broker.

4. **MISCELLANEOUS:**

A. INDEPENDENT CONTRACTOR: It is understood and agreed that the relationship between Broker and Carrier is that of independent contractor and that no joint venture, partnership, principal/agent, fiduciary or employer/employee relationship exists, or is intended. Carrier shall provide the sole supervision and shall have exclusive control over the operations of its employees, contractors, subcontractors, agents, as well as all vehicles and equipment used to perform its transportation services hereunder. Broker has no control of any kind over Carrier, including but not limited to routing of freight, and nothing contained herein shall be construed to be inconsistent with this provision.

B. NON-EXCLUSIVE AGREEMENT: Carrier and Broker acknowledge and agree that this Agreement does not bind the respective Parties to exclusive services to each other. Either party may enter into similar agreements with other carriers, brokers, or freight forwarders.

C. WAIVER OF PROVISIONS:
   i. Failure of either Party to enforce a breach or waiver of any provision or term of this Agreement shall not be deemed to constitute a waiver of any subsequent failure or breach, and shall not affect or limit the right of either Party to thereafter enforce such a term or provision.
   ii. This Agreement is for specified services pursuant to 49 U.S.C. §14101(b). To the extent that terms and conditions herein are inconsistent with Part (b), Subtitle IV, of Title 49 U.S.C. (ICC Termination Act of 1995), the Parties expressly waive any or all rights and remedies they may have under the Act related thereto. However, nothing in this Agreement shall be construed as waiving any provision governing Carrier's compliance with all statutory registration, insurance, and/or safety related requirements relative to motor carriers, such as Carrier.

D. GOVERNING LAW: Unless preempted or controlled by federal transportation law and regulations, this Agreement shall be governed and construed in accordance with the laws of Florida, excluding that State's choice-of-law principles, and all claims relating to or arising out of this Agreement, or the breach thereof, whether sounding in contract, tort or otherwise, shall likewise be governed by the laws of Florida, excluding that State's choice-of-law principles. The Parties agree and consent to the exclusive jurisdiction of the State and Federal courts with venue in Hillsborough County, Florida in any action to interpret or enforce this Agreement. The prevailing party shall be entitled to recovery of costs, expenses and reasonable attorney fees as well as those incurred in any action for injunctive relief.

E. NO BACK SOLICITATION:
   i. Unless otherwise agreed in writing, Carrier shall not knowingly solicit freight shipments for a period of twenty-four (24) months following termination of this agreement for any reason, from any shipper, consignor, consignee, or other customer of Broker, when such shipments of shipper customers were first tendered to Carrier by Broker.
   ii. In the event of breach of this provision, Broker shall be entitled, for a period of twenty-four (24) months following delivery of the last shipment transported by Carrier under this Agreement, to a commission of fifteen percent (15%) of the gross transportation revenue (as evidenced by freight bills) received by Carrier for the

transportation of said freight as liquidated damages. Additionally, Broker may seek injunctive relief and Carrier waives any argument that Broker has an adequate remedy at law.

F. <u>CONFIDENTIALITY</u>:
  i. In addition to Confidential Information protected by law, statutory or otherwise, the Parties agree that all of their financial information and that of their customers, including but not limited to freight and brokerage rates, amounts received for brokerage services, amounts of freight charges collected, freight volume requirements, as well as personal customer information, customer shipping or other logistics requirements shared or learned between the Parties and their customers, shall be treated as Confidential, and shall not be disclosed or used for any reason without prior written consent.
  ii. In the event of violation of this Confidentiality paragraph, the Parties agree that the remedy at law, including monetary damages, may be inadequate and that the Parties shall be entitled, in addition to any other remedy they may have, to an injunction restraining the violating Party from further violation of this Agreement.

G. The limitations of liability for cargo loss and damage as well as other liabilities, arising out of the transportation of shipments, which originate outside the United States of America, may be subject to the laws of the country of origination.

H. <u>MODIFICATION OF AGREEMENT</u>: This Agreement may not be amended except by mutual written agreement of both Parties, or the procedures set forth above in Sections 2.B. and 2.C.

I. <u>NOTICES</u>: Unless the Parties notify each other in writing of a change of address, any and all notices required or permitted to be given under this Agreement shall be delivered by (i) hand delivery, (ii) a nationally recognized overnight courier service for next business day delivery (any notice given hereunder pursuant to this Section 4.I.(i) or (ii) shall be deemed delivered when received or when receipt is refused as evidenced by the records of the delivery or courier service), (iii) the United States Postal Service when sent registered or certified mail, return receipt requested, postage prepaid (any properly addressed notice given hereunder pursuant to Section 4.I.(iii) shall be deemed delivered when the return receipt thereof is signed, except that any notice which is correctly addressed but which is returned by the postal service and undeliverable shall be deemed to have been received on the earliest date on which the postal service attempted delivery as indicated by postal service endorsement on the return receipt form), (iv) electronic mail, or (v) facsimile transmission (any notice given hereunder pursuant to Section 4.I.(iv) or (v) shall be deemed delivered when sent (as evidenced by e-mail records and facsimile confirmation) provided that a hard copy of such notice shall be sent simultaneously by one of the other delivery methods permitted in Sections 4.I.(i)-(iii)), and in each case above addressed to each party at its mailing address, electronic mail address or facsimile number as set forth below.

J. <u>TERM</u>: The term of this Agreement shall be one year from the date hereof and thereafter it shall automatically be renewed for successive one (1) year periods, unless terminated, upon thirty (30) day's prior written notice, with or without cause, by either Party at any time, including the initial term. In

      the event of termination of this Agreement for any reason, the Parties shall be obligated to complete performance of any work in progress in accordance with the terms of this Agreement.

K. **SEVERANCE; SURVIVAL**: In the event any of the terms of this Agreement are determined to be invalid or unenforceable, no other terms shall be affected and the unaffected terms shall remain valid and enforceable as written. The representations, rights and obligations of the parties hereunder shall survive termination of this Agreement for any reason.

L. **COUNTERPARTS**: This Agreement may be executed in any number of counterparts each of which shall be deemed to be a duplicate original hereof.

M. **EMAIL AND FAX CONSENT**: The Parties to this Agreement are authorized to email or fax to each other at the numbers shown herein (or otherwise modified in writing from time to time) shipment availabilities, equipment and rate promotions, or any advertisements of new services. The facsimile, scanned (e.g., .pdf) or other electronic signature of any Party hereto shall be deemed an original for all purposes.

N. **ENTIRE AGREEMENT**: This Agreement contains the entire understanding of the Parties and supersedes all verbal or written prior agreements, arrangements, and understandings of the Parties relating to the subject matter stated herein. The Parties further intend that this Agreement constitutes the complete and exclusive statement of its terms, and that no extrinsic evidence may be introduced to reform this Agreement in any judicial or arbitration proceeding involving this Agreement.

IN WITNESS WHEREOF, the Parties have signed this Agreement as of the date first above written.

### Appendix A

If acting in the capacity of a Registered Property Broker, Carrier agrees to the following:

Carrier shall be solely responsible for exercising due diligence in selecting carriers for the performance of this Agreement, which includes, but is not limited to: verifying the carrier's operating authority (state and/or federal), obtaining proof of the carrier's insurance coverage, verifying the carrier does not have an "Unsatisfactory" or "Conditional" safety rating with the Federal Motor Carrier Safety Administration, executing a written contract with carriers, which includes carrier's representation of compliance with all applicable state and federal safety regulations, and for intermodal shipments, contracting only with motor carriers who have executed, and represent that they are in compliance with the terms of a current Uniform Intermodal Interchange Agreement (UIIA).

Carrier shall procure and maintain its own insurance coverage and shall provide Broker with proof of insurance satisfactory to Broker.

Carrier shall not, nor allow a carrier to, re-broker, sub-broker, subcontract, assign, interline, or warehouse any shipments hereunder without the prior written consent of Broker.

"I, Lisa Stinson, am the Dispatcher for Ups Freight. I am authorized to execute the contract set out above dated 6/30/2016 7:39:30 AM Pacific Time between Blue-Grace Logistics LLC and Ups Freight and legally bind the company to the terms and conditions set forth therein. This electronic signature serves as an original and any electronic version and other signatures are incorporated as if originals into the original document. This electronic signature shall have the same force and effect as an original source.

BY CLICKING THE ACCEPTANCE BUTTON, I ACKNOWLEDGE THAT I HAVE READ AND UNDERSTAND THE AGREEMENT AND AGREE TO THE ENTIRETY OF THE TERMS & CONDITIONS CONTAINED THEREIN. THE AGREEMENT SHALL BE BINDING ON UPS FREIGHT. I UNDERSTAND AND ACKNOWLEDGE THAT UPS FREIGHT IS THE "CARRIER " AS THAT TERM IS USED IN THE AGREEMENT."

History ID                                              1247302

**Agreement History**

Friday, July 31, 2015 14:08:51                          View Agreement

5388 Sterling Center Drive, Westlake Village, CA 91361
Copyright © 2021 Registry Monitoring Insurance Services, Inc.
800-400-4924

If you no longer wish to receive these emails, click here for further instructions.